No. 15-cv-00069-LM

---

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

---

GT ADVANCED TECHNOLOGIES, INC, *et al*., Appellants,

v.

UNITED STATES TRUSTEE, Appellee.

---

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

---

**BRIEF OF APPELLEE WILLIAM K. HARRINGTON,
UNITED STATES TRUSTEE**

---

RAMONA D. ELLIOTT
Deputy Director/General Counsel
P. MATTHEW SUTKO
Associate General Counsel
SUMI K. SAKATA
Trial Attorney
Department of Justice
Executive Office for U.S. Trustees
441 G St., NW, Suite 6150
Washington, DC  20530
(202) 616-0127

GERALDINE L. KARONIS
Assistant United States Trustee
ANN MARIE DIRSA
Trial Attorney
Department of Justice
1000 Elm Street, Suite 605
Manchester, NH 03101

WILLIAM K. HARRINGTON
United States Trustee, Region 1

ERIC K. BRADFORD BBO#560231
Trial Attorney
Department of Justice
John W. McCormack Post Office &
Courthouse
5 Post Office Square, 10th Floor, Suite 1000
Boston, MA 02109-3934
PHONE:       (617) 788-0415
FAX:         (617) 565-6368
Eric.K.Bradford@USDOJ.gov

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................. I

TABLE OF AUTHORITIES ........................................................................................ III

STATEMENT OF APPELLATE JURISDICTION .................................................... 1

STATEMENT OF THE ISSUES ................................................................................. 1

STANDARD OF REVIEW ........................................................................................... 2

STATEMENT OF THE CASE ..................................................................................... 3

    I.   STATUTORY FRAMEWORK .............................................................................. 3

        A.  Employee and Executive Compensation ............................................... 3

        B.  Transactions Outside of the Ordinary Course of Business ................... 4

        C.  The Office of the United States Trustee ................................................ 5

   II.  STATEMENT OF FACTS .................................................................................... 6

        A.  Bankruptcy Filing ................................................................................. 6

        B.  GTAT's Proposed KEIP ........................................................................ 7

        C.  GTAT's Proposed KERP ....................................................................... 9

        D.  GTAT's Management Incentive Plan .................................................. 10

        E.  Objections to GTAT's Proposed KEIP and KERP .............................. 10

        F.  Bankruptcy Court Evidentiary Hearing on February 5, 2015 ........... 11

           1.  Andrew Pfeifer ............................................................................. 11

           2.  Brian Cumberland ....................................................................... 12

           3.  Neil Augustine ............................................................................. 13

              a.  Category 1: ASF Furnace Sales ........................................ 14

      b.   Category 2:  Cash Operating Expense Run-Rate .................................................. 15

      c.   Category 3:  Gross Proceeds from Sale of Non-ASF Furnaces Assets at Mesa ... 15

      d.   Category 4:  Merlin Project..................................................................................... 15

      e.   Category 5:  Crating Costs ...................................................................................... 16

    4.   Motivation of Proposed KEIP Participants ................................................................ 16

    5.   Bankruptcy Court Denial of KEIP and KERP ........................................................... 19

SUMMARY OF ARGUMENT ..................................................................................................... 20

ARGUMENT .................................................................................................................................. 23

I.  THE BANKRUPTCY COURT DID NOT CLEARLY ERR IN DENYING DEBTORS' KEIP .............. 23

   A.   The Bankruptcy Court Applied the Proper Standard Under Section 503(c)(1) ........... 23

   B.   The Bankruptcy Court Did Not Clearly Err in Finding That Debtors' KEIP Was a

       Retention Plan ............................................................................................................. 25

II.  THE BANKRUPTCY COURT DID NOT CLEARLY ERR IN DENYING DEBTORS' KERP ............ 28

   A.   The Bankruptcy Court Properly Conducted An Independent Analysis of the KERP .. 28

     1.   Under Section 503(c)(3), the Bankruptcy Court Must Find that Payments Out of the

        Ordinary Course of Business Are Justified By the Facts and Circumstances of the

        Case ....................................................................................................................... 28

     2.   Independent Analysis By the Bankruptcy Court Is Proper Under the Section 363(b)

        "Sound Business Judgment" Test ......................................................................... 30

   B.   The Bankruptcy Court Did Not Clearly Err In Finding That Debtors' KERP Would Be

       Ineffective ................................................................................................................... 34

CONCLUSION ............................................................................................................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re Aerovox,*
  269 B.R. 74 (Bankr. D. Mass. 2001) ...................................................................................33

*Anderson v. Bessemer City,*
  470 U.S. 564 (1985)...............................................................................................................2, 3

*BFP v. Resolution Trust, Corp.,*
  511 U.S. 531 (1994)...............................................................................................................30

*In re The Bible Speaks,*
  869 F.2d 628 (1st Cir. 1989)...........................................................................................2, 3, 35

*Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re*
    *Montgomery Ward Holding Corp.),*
  242 B.R. 147 (D. Del. 1999)..............................................................................................5, 29

*In re Dana Corp.,*
  358 B.R. 567 (Bankr. S.D.N.Y. 2006) ..................................................................10, 23, 32, 35

*In re El San Juan Hotel,*
  809 F.2d 151 (1st Cir. 1987)................................................................................................3

*In re Hawker Beechcraft, Inc.,*
  479 B.R. 308 (S.D.N.Y. 2012)...........................................................................24, 25, 27, 28

*In re Hill,*
  562 F.3d 29 (1st Cir. 2009)..................................................................................................2

*In re IDC Clambakes, Inc.,*
  727 F.3d 58 (1st Cir. 2013)...................................................................................................2

*Lamie v. United States Trustee,*
  540 U.S. 526 (2004)...............................................................................................................28

*In re The Lionel Corp.,*
  722 F.2d 1063 (2d Cir. 1983)........................................................................................31, 32

*In re Logical Software,*
  66 B.R. 683 (Bankr. D. Mass. 1986) ....................................................................................33

*Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.,*
  756 F.2d 1043 (4th Cir. 1985) ...............................................................................................33

*In re Perry*,
    391 F.3d 282 (1st Cir. 2004) ............................................................................1

*In re Pilgrim's Pride Corp.*,
    401 B.R. 229 (Bankr. N.D. Tex. 2009) ...................................................24, 30

*In re Plaza de Diego Shopping Ctr., Inc.*,
    911 F.2d 820 (1st Cir. 1990) ............................................................................5

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    132 S. Ct. 2065 (2012) ..............................................................................29, 30

*In re U.S. Airways, Inc.*,
    329 B.R. 793 (Bankr. E.D. Va. 2005) .............................................................24

*In re United Healthcare Sys., Inc.*,
    No. 97-1159, 1997 WL 176574 (D.N.J. Mar. 26, 1997) ................................33

*United Student Aid Funds, Inc. v. Espinosa*,
    559 U.S. 260 (2010) .................................................................................28, 29

*In re Velo Holdings Inc.*,
    472 B.R. 201 (Bankr. S.D.N.Y. 2012) .......................................................24, 26

*In re Winthrop Old Farm Nurseries, Inc.*,
    50 F.3d 72 (1st Cir. 1995) ................................................................................2

## Statutes

11 U.S.C. § 307 ...................................................................................................5

11 U.S.C. § 363(b) ....................................................................................... *passim*

11 U.S.C. § 363(b)(1) ........................................................................5, 29, 30, 32

11 U.S.C. § 363(c) ...............................................................................................4

11 U.S.C. § 363(c)(1) .........................................................................................10

11 U.S.C. § 365(a) .............................................................................................33

11 U.S.C. § 503(b) ...............................................................................................3

11 U.S.C. § 503(c) ....................................................................................... *passim*

11 U.S.C. § 503(c)(1) ................................................................................. *passim*

11 U.S.C. § 503(c)(3) ................................................................................. *passim*

11 U.S.C. § 507 ............................................................................................................3

11 U.S.C. § 1107 ..........................................................................................................5

11 U.S.C. § 1325(a)(1) ...............................................................................................29

28 U.S.C. § 157(a) .......................................................................................................1

28 U.S.C. § 157(b) .......................................................................................................1

28 U.S.C. § 158(a) .......................................................................................................1

28 U.S.C. §158(a)(1) ....................................................................................................1

28 U.S.C. § 158(c)(2) ...................................................................................................1

28 U.S.C. § 586(a)(3) ...................................................................................................5

28 U.S.C. § 1334(a) .....................................................................................................1

Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, 119 Stat. 23 ...................................................................................... *passim*

## Other Authorities

COLLIER ON BANKRUPTCY (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2013)
.................................................................................................23, 30, 31, 33

Fed. R. Bankr. P. 7052 ...............................................................................................19

Fed. R. Bankr. P. 8002 .................................................................................................1

Fed. R. Bankr. P. 9014 ...............................................................................................19

*Grassley Probes DOJ for Policies on KERPs*, 31-2 AM. BANKR. INST. J. 8 (March 2012) ......................................................................................................24

H.R. Rep. No. 95-595 (1977)........................................................................................5

WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 608 (9th ed. 1984)........................26

## STATEMENT OF APPELLATE JURISDICTION

This Court has jurisdiction to hear this appeal under 28 U.S.C. §158(a)(1), which grants

the district court jurisdiction to hear appeals from final judgments, orders, and decrees of

bankruptcy judges.  The United States Bankruptcy Court for the District of New Hampshire had

jurisdiction over this bankruptcy case under 28 U.S.C. §§ 157(a) and (b), and 1334(a).  The

bankruptcy court's final order denied the motion of appellants GT Advanced Technologies Inc.,

GTAT Corporation, GT Advanced Equipment Holding LLC, GT Equipment Holdings, Inc.,

Lindbergh Acquisition Corp., GT Sapphire Systems Holding LLC, GT Advanced Cz LLC, GT

Sapphire Systems Group LLC, and GT Advanced Technologies Limited (collectively, "GTAT")

to adopt a key employee incentive plan ("KEIP") and a key employee retention plan ("KERP")

under 11 U.S.C. §§ 363(b) and 503(c).  The bankruptcy court's order was entered on February

11, 2015.  (JA-001003).[1]  The bankruptcy court's order denying GTAT's motion to adopt a KEIP

and KERP "finally dispose[d] of all the issues pertaining to a discrete dispute within the larger

proceeding," *In re Perry*, 391 F.3d 282, 285 (1st Cir. 2004), and thus is a final order.

GTAT moved for reconsideration of the bankruptcy court's denial of its motion to adopt

a KEIP and KERP on February 10, 2015.  (JA-000944-1002).  The bankruptcy court denied

GTAT's motion for reconsideration on February 11, 2015.  (JA-001003).  GTAT timely filed a

notice of appeal under 28 U.S.C. §§158(a) and (c)(2) and Fed. R. Bankr. P. 8002 on February 23,

2015.  (JA-001005).

## STATEMENT OF THE ISSUES

(1)   11 U.S.C. §503(c)(1) prohibits debtors from paying insiders for the purpose of inducing

them to stay through reorganization unless certain conditions are met.  Here, GTAT attempted to

---

[1] Citations to the parties' joint appendix are referred to as JA-___.  Citations to GTAT's brief are
referred to as App. Br. ___.

avoid this prohibition by proposing to pay 'incentive" bonuses to its insiders.  GTAT admitted

that it wanted to pay these bonuses because otherwise the insiders might leave.  Did the

bankruptcy court clearly err in finding that GTAT had proposed a prohibited insider retention

plan?

(2)   11 U.S.C. § 503(c)(3) prohibits debtors from paying employees outside the ordinary

course of business unless such payments are justified by the facts and circumstances of the case.

Here, GTAT proposed to pay retention bonuses to certain non-insider employees, but the

bankruptcy court found the proposed bonuses would be ineffective.  Did the bankruptcy court

clearly err in denying GTAT's proposed plan as not justified?

## STANDARD OF REVIEW

An appellate court reviews the bankruptcy court's conclusions of law *de novo* and

findings of fact for clear error.  *In re Hill*, 562 F.3d 29, 32 (1st Cir. 2009).  The bankruptcy

court's interpretation of the relevant statutes presents a question of law, while its application of

those statutes to the facts of the case "presents a mixed question of law and fact" that the

appellate court reviews for clear error unless the bankruptcy court's analysis was "infected by

legal error."  *In re Winthrop Old Farm Nurseries, Inc.*, 50 F.3d 72, 73 (1st Cir. 1995).

The First Circuit has held that in a bankruptcy case, "the clearly erroneous standard was

especially appropriate where credibility was at issue,… for only the trial judge can be aware of

the variations in demeanor and tone of voice that bear so heavily on the listener's understanding

of and belief in what is said."  *In re The Bible Speaks*, 869 F.2d 628, 629-630 (1st Cir. 1989)

(citing *Anderson v. Bessemer City*, 470 U.S. 564, 573-74 (1985)).  "If the bankruptcy court's

account of the evidence is plausible in light of the record viewed in its entirety," the appellate

court may not reverse.  *In re IDC Clambakes, Inc.*, 727 F.3d 58, 64 (1st Cir. 2013).  "Where

there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *The Bible Speaks*, 869 F.2d at 630 (quoting *Anderson*, 470 U.S. at 573).

This Court may affirm on any ground supported by the record. *In re El San Juan Hotel*, 809 F.2d 151, 154 (1st Cir. 1987).

## STATEMENT OF THE CASE

### I.     Statutory Framework

#### A.         Employee and Executive Compensation

The Bankruptcy Code classifies expenses of the bankruptcy estate as "administrative expenses," which are paid in full before any distribution is made to unsecured creditors. See 11 U.S.C. §§ 503(b), 507.  Section 503(b) provides, in relevant part, that "there shall be allowed administrative expenses, … including ... (1)(a)(i) wages, salaries and commissions for services rendered after the commencement of the case…."

Section 503(c) of the Bankruptcy Code was enacted as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("the Reform Act") (Pub. L. 109-8, 119 Stat. 23).  Among other matters, it greatly limits the permissible use of bonuses to insiders of the debtor-in-possession, as well as other payments that are not in the ordinary course of business.

More specifically, section 503(c) of the Bankruptcy Code provides in pertinent part:

Notwithstanding subsection (b), **there shall neither be allowed, nor paid** –

(1) a transfer made to, or an obligation incurred for the benefit of, an insider of the debtor **for the purpose of inducing such person to remain with the debtors' business**, absent a finding by the court based on evidence in the record that

> (A) the transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;

> (B) the services provided by the person are essential to the survival of the business; and

> (C) either –

(i) the amount of the transfer made to, or obligation incurred for the benefit of, the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar kind given to nonmanagement employees for any purpose during the calendar year in which the transfer is made or the obligation is incurred; or

(ii) if no such similar transfers were made to, or obligations were incurred for the benefit of, such nonmanagement employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made to or incurred for the benefit of such insider for any purpose during the calendar year before the year in which such transfer is made or obligation is incurred;

…. or

(3) other transfers or obligations that are **outside the ordinary course of business** and **not justified by the facts and circumstances of the case**, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition . . . .

11 U.S.C. § 503(c) (emphasis added).

Thus, under section 503(c)(1), debtors may not pay its insiders to induce those insiders to stay with the debtor through reorganization, unless the strict conditions set out in subsections 503(c)(1)(A), (B), and (C) are met.  11 U.S.C. § 503(c)(1).  These conditions require: (1) the insider have a bona fide job offer elsewhere, (2) the insider's services must be "essential" to the debtor, and (3) the payment must be under certain monetary limits.  *Id.*

In addition, under section 503(c)(3), debtors may not make any payments that are outside the ordinary course of business and not governed by the other subsections of 503(c), unless they are justified by the facts and circumstances of the case.  11 U.S.C. § 503(c)(3).

**B.      Transactions Outside of the Ordinary Course of Business**

When an entity files for chapter 11 bankruptcy protection, the debtor is deemed a debtor-in-possession, and unless ordered otherwise, the debtor has the authority to continue conducting its regular business operations as it did before the bankruptcy filing ("prepetition"). 11 U.S.C. §§

4

363(c), 1107. However, any transactions outside of the ordinary course of the debtor's business must be approved by the bankruptcy court. 11 U.S.C. § 363(b).

Specifically, section 363(b)(1) provides, in relevant part, "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate…." 11 U.S.C. § 363(b)(1).  The statutory language provides no standard governing how the bankruptcy court should review the transaction.

Prior to the adoption of section 503(c) in the Reform Act, employee retention and incentive programs implemented in connection with a bankruptcy reorganization were treated as non-ordinary-course transactions subject to approval under section 363(b).  *See, e.g., Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 152-53 (D. Del. 1999).  Currently such motions are evaluated under section 503(c).  11 U.S.C. § 503(c).

### C.      The Office of the United States Trustee

United States Trustees "serve as bankruptcy watch-dogs to prevent fraud, dishonesty, and overreaching in the bankruptcy arena." H.R. Rep. No. 95-595, at 88 (1977).  The United States Trustee Program thus acts in the public interest to promote the efficiency, and to protect and preserve the integrity, of the bankruptcy system.  The United States Trustees are responsible for "ensuring that bankruptcy cases are conducted according to law."  *Id*. at 109.  To this end, Congress has given United States Trustees authority to "supervise the administration of cases and trustees" in all bankruptcy cases through a range of oversight responsibilities, 28 U.S.C. § 586(a)(3), and provided that United States Trustees "may raise and may appear and be heard on any issue in any [bankruptcy] case or proceeding," 11 U.S.C. § 307; *In re Plaza de Diego*

*Shopping Ctr., Inc.*, 911 F.2d 820, 824 (1st Cir. 1990) (vindicating United States Trustee's public interest standing).

## II.  Statement of Facts

### A.  Bankruptcy Filing

GTAT is a technology company that produces advanced materials and equipment for the global consumer electronics, power electronics, solar, and LED industries.  A year before filing for bankruptcy, GTAT entered into an exclusive manufacturing and supply agreement with Apple Inc. that precipitated an acute cash liquidity crisis.

GTAT filed a voluntary chapter 11 petition on October 6, 2014. (JA-000010).  At the time of its bankruptcy filing, GTAT had over a billion dollars in assets.  (JA-000834-35).  Within the first two months of filing its bankruptcy petition, GTAT suffered cumulative losses of 310 million dollars.  (JA-000871).  Since entering bankruptcy, GTAT has laid off 820 employees, approximately 70% of its workforce.  (JA-000784, JA-000796).

Despite their severe financial straits, less than three months after filing for bankruptcy, GTAT filed a motion seeking approval from the bankruptcy court to pay bonuses to senior management and a select group of employees.  (JA-000337-369).  GTAT sought permission to adopt: (1) a "key employee incentive plan" ("KEIP") for nine insiders, and (2) a "key employee retention plan" ("KERP") for more than two dozen other employees that GTAT claims are not insiders.  (JA-000314-321).  GTAT later proposed modifications to the plans after negotiations with the unsecured creditors' committee.  (JA-000635-661; JA-001167-JA-001215-Filed Under Seal).

In addition to the proposed KEIP and KERP, GTAT also plans to implement a "management incentive plan" for 173 employees who were not beneficiaries of the KEIP or KERP.  (JA-000630; JA-000797).

**B.      GTAT's Proposed KEIP**

The KEIP purports to offer "incentive" bonuses to GTAT's senior management.  GTAT does not dispute that the KEIP participants are "insiders" for purposes of section 503(c)(1), which prohibits payment of retention bonuses to insiders absent certain conditions not met here.  (App. Br. at 24).  GTAT claimed that because the KEIP is an "incentive" plan, and not a retention plan, the bonuses would not be prohibited under section 503(c)(1).  (JA-000356).  GTAT therefore sought court approval for the KEIP under section 503(c)(3). (JA-000361).

The KEIP proposed to pay bonuses to nine identified insiders, including GTAT's chief executive officer, executive vice president, and general counsel.  (JA-000770).  Payment of the bonuses would depend upon GTAT's performance in five self-proclaimed "key performance indicators," as measured on the earlier of (1) the emergence of GTAT from bankruptcy upon confirmation of a reorganization plan, or (2) a sale of all or substantially all of GTAT's assets.  (JA-000639).

The performance indicators involved measurements in five categories:

(1)  The value of advanced sapphire crystallization ("ASF") furnaces shipped;

(2) Reduction in cash operating expense run-rate;

(3) Gross proceeds from monetization of assets from the sapphire manufacturing facility in Mesa, Arizona ("Mesa facility") that GTAT is winding down;

(4) Advancement in a new project (the "Merlin" project) involving a solar technology

that GTAT is developing, with progress measured by sales targets and capital

expenditures; and

(5) Reduction in crating costs of ASF furnaces located in the Mesa facility.

(JA-000545).  Each participating insider was assigned a range of possible bonuses, from

"threshold" to "target" to "stretch."  (JA-000546).[2]  Corresponding performance levels –

"threshold," "target," and "stretch" – were set in each KEIP category.  *Id.*

The insiders' cumulative "threshold" bonus started at $1,137,500, through a cumulative

"target" bonus of $1,875,000, up to a cumulative "stretch" bonus of $3,375,000.  (JA-000996).

Assuming GTAT achieved its self-established target performance in the five performance

indicator categories, the nine insiders would receive bonuses ranging from 19% to 83% of their

base salary.  (JA-000546).

Each category was assigned a particular weight, representing a percentage of the insiders'

bonus: (1) ASF furnaces at 40%, (2) advancement of the Merlin project at 30%, (3) reduction of

cash operating expenses at 15%, (4) gross proceeds of Mesa's asset monetization at 7.5%, and

(5) reduction in crating costs at 7.5%.  *Id.*  GTAT did not need to meet the threshold performance

for all five categories before it paid the insiders a bonus; instead, if a threshold performance was

not met for a particular category, the insiders would not earn a bonus for that category.  (JA-

000546, JA-000708).   Thus, for example, if GTAT did not meet the threshold performance level

in the category of reduction of cash operating expenses, which was weighted at 15%, but met the

---

[2]  The bankruptcy court permitted GTAT to file under seal certain documents related to its
motion for approval of its KERP and KEIP.  (Doc. No. 1245).  For additional details regarding
the individual bonus amounts under the KEIP, see JA-001188 –Filed Under Seal; JA-001279-
1281-Filed Under Seal.

threshold level in all other categories, the insiders would collectively receive 85% of their threshold $1,137,500 bonus.

### C.    GTAT's Proposed KERP

The KERP proposed to pay retention bonuses to 26 employees that GTAT claims are not insiders.  (JA-000548).  Because these employees are purportedly not insiders, their receipt of retention bonuses would not be prohibited under section 503(c)(1).  (JA-000359).  GTAT thus sought approval for the KERP under section 503(c)(3), which prohibits payments outside of the ordinary course of business unless they are justified under the facts and circumstances.  (JA-000361).

The KERP would pay the retention bonuses if the identified employee remained with GTAT until the earlier of (1) the emergence of GTAT from bankruptcy upon confirmation of a reorganization plan, or (2) a sale of all or substantially all of GTAT's assets.  (JA-000549).  The proposed bonuses range from 8% to 48% of the employees' base salaries, or, more specifically, from $10,000 to $100,000, depending on the employee.[3]  (JA-000548).  The KERP would allow an additional disbursement of up to $300,000 in the discretion of GTAT's chief executive officer, subject to consent of the official committee of unsecured creditors.  *Id.*  Assuming all retention bonuses were distributed, the total cost to GTAT would be $1.25 million.  *Id.*

---

[3] For additional details about the bonuses for the KERP participants, see JA-001202-Filed Under Seal.

### D.     GTAT's Management Incentive Plan[4]

GTAT has indicated that it will adopt a management incentive plan that would apply to approximately 175 employees who are not proposed participants of the KEIP or KERP, and would distribute bonuses if certain performance objectives are achieved.  (JA-000630). Assuming the management incentive plan participants meet the target level of performance under the plan, they would be eligible for bonuses totaling approximately $1,818,540, for an average of over $10,000 per participant.  *Id*.  The bonuses would be paid in the first quarter of 2016.  *Id*.

Pre-petition, it was ordinary practice for senior executives, such as the proposed KEIP beneficiaries, to receive annual bonuses through the management incentive plan.  (JA-000798).

### E.     Objections to GTAT's Proposed KEIP and KERP

The United States Trustee and Mr. T. Richard Faloh, a shareholder in GTAT, both objected to GTAT's motion for approval of its KEIP and KERP.  (JA-000472-481; JA-000482-501).  The United States Trustee objected that GTAT had not met its burden of proof under section 503(c) to demonstrate that (1) the KEIP was not a retention plan; (2) the participants of the KERP were not insiders;[5] and (3) that the plans were "justified under the facts and circumstances of the case."  (JA-000483).

---

[4] GTAT has not sought court approval for its non-retentive management incentive plan, presumably because utilization of a similar plan has been part of its past practice and is thus within the ordinary course of business as permitted under the Bankruptcy Code to a debtor-in-possession.  (JA-000775); *In re Dana Corp*., 358 B.R. 567, 581 (Bankr. S.D.N.Y. 2006) (short-term incentive plan that was common component of compensation plan for over 50 years was within ordinary court of business as permitted under section 363(c)(1)).

[5] Because the bankruptcy court denied the KERP in its entirety as not justified pursuant to section 503(c)(3), *see* infra p. 20, it never reached the United States Trustee's objection regarding GTAT's failure to meet its burden of proving the KERP participant were not insiders. The United States Trustee maintains his objection to GTAT's proposed KERP on this ground.

F.      **Bankruptcy Court Evidentiary Hearing on February 5, 2015**

The bankruptcy court held an evidentiary hearing on February 5, 2015, to resolve GTAT's motion.  At the hearing, GTAT put forth four witnesses, each of whom also submitted a written declaration that was admitted into evidence.  (JA-000615-676; JA-001167-215-Filed Under Seal; JA-001310-327-Filed Under Seal).  Three of the witnesses testified on direct examination, and all four of the witnesses testified under cross-examination.[6]  (JA-000792; JA-000803; JA-000806; JA-000816; JA-000829; JA-000840; JA-000856; JA-000864; JA-000890).

1.      **Andrew Pfeifer**

The first witness, Andrew Pfeifer, is GTAT's senior director of corporate compensation and benefits.  He testified on direct examination that, in light of the lay-offs of 820 employees, the current workforce was facing additional pressure.  (JA-000796).  He stated, "Of the people remaining, the primary concerns that they have had are, okay, will I be included in the next round, what's the long-term implication of me staying, what opportunities will exist for us if we stay, and so the KERP would be very important to that."  *Id*.  He further testified that employees are aware that GTAT normally has a management incentive plan, but the management incentive plan has not prevented people from resigning.  (JA-000800).

In response to the court's inquiry regarding the advantage of the KERP, which would be offered only to 26 employees, over the traditional and broadly applicable management incentive plan, Mr. Pfeifer testified that the 26 proposed participants in the KERP could potentially receive payments 5 to 6 months earlier than if they were participants in the management incentive plan.  (JA-000800-01). He further testified that the management incentive plan participants would not be guaranteed payments, in contrast to the 26 KERP beneficiaries.  (JA-000801).

---

[6]  The fourth witness, Richard Newsted, is a member of GTAT's restructuring committee.  He submitted his written statement in lieu of direct testimony at the hearing.  (JA-000889).

On cross-examination, Mr. Pfeifer testified that he has had a number of conversations with employees, both on and off the KERP list, who informed him that they had been presented with other job opportunities, and asking his advice on whether to pursue them.  (JA-000809).  He stated, "I advise them that they need to do what's best for them because in many cases people are nervous about what they're reading in the press, nervous about seeing other people leave."  *Id.* He continued, "My general philosophy is you need to take care of yourself and your family first."  *Id.*

When asked about GTAT's cumulative losses since filing for bankruptcy and whether he thought GTAT had the financial ability to make the KERP payments, Mr. Pfeifer responded, "If we meet the performance criteria of emerging from Chapter 11, I would… assume that that had been factored into the financial modeling."  (JA-000811).

Mr. Pfeifer confirmed, in response to the court's inquiries, that he was a proposed KERP beneficiary.  (JA-000815).  The court then asked Mr. Pfeifer about the KERP's potential impact on his decision if he were he to receive another job offer:

> THE COURT: Have you sent out any resumes looking for another job?
>
> MR. PFEIFER: Yes.
>
> THE COURT: If you found another job that pays as much or more will your participation in the KEIP or the KERP change your approach?
>
> MR. PFEIFER: It certainly gives me pause.

(JA-000815-16).

### 2.    Brian Cumberland

GTAT's second witness, Brian Cumberland, is a managing director of the compensation and benefits practice at Alvarez & Marsal Taxand, LLC, a consulting firm.  (JA-000635).

According to his written statement, Mr. Cumberland was hired after GTAT filed for bankruptcy to design the KEIP and KERP proposals. (JA-000638).

Mr. Cumberland declared that the nine insiders who were the proposed KEIP participants, had traditionally received compensation in three forms: (1) base salary, (2) cash bonus awards or commissions, and (3) equity incentive awards. (JA-000640). He further declared that in prior years, a significant portion of the proposed KEIP participants' compensation -- on average approximately 41% in 2013 -- had come in the form of equity. (JA-000641). Because of the "precipitous decline" in the value of the GTAT's stock, their equity awards essentially had "no value." *Id.* Mr. Cumberland stated that because GTAT share prices had dropped, the proposed KEIP participants' compensation had fallen below industry market levels. *Id.*

At the hearing, Mr. Cumberland testified that he evaluated the reasonableness of the KEIP by three ways: (1) compared to the market; (2) compared to historic compensation; and (3) compared to compensation in a peer group of companies in similar bankruptcies. (JA-000820). He testified that in determining an appropriate peer group, because GTAT had a billion dollars in assets before filing for bankruptcy, he looked at companies that had between one and three billion in assets. (JA-000833-34). In evaluating the reasonableness of the KERP and KEIP, he acknowledged that he had not looked at GTAT's over $300 million post-petition losses, nor did he know what GTAT's post-petition income was. (JA-000831, JA-000837). He did not think this impaired his ability to assess the reasonableness of the proposed plan. (JA-000837-38).

### 3.    Neil Augustine

The third witness, Neil Augustine, is an executive vice chairman of Rothschild Inc. (JA-000662). Rothschild Inc. was retained by GTAT at the end of September 2014 as a restructuring

consultant.  (JA-000664).  He has worked with GTAT senior management in creating a new business plan ("the Business Plan") for GTAT's reorganization.  (JA-000666).  Outside of representative statements made by attorneys at the hearing, Mr. Augustine's written declaration and testimony were the only evidence submitted regarding the degree of difficulty in achieving the five performance indicator categories that would be used to determine the payment and amount of KEIP bonuses.

### a.  Category 1: ASF Furnace Sales

The first KEIP category is the value of ASF furnaces shipped.  (JA-000669-670; Tr. 94:13-96:3).  The plan sets a minimum number of ASF furnaces to be sold before a KEIP bonus could be earned, and set a minimum average price that is 90% of the average sales price in the Business Plan.  (JA--000747).  The target level for this category is $180 million, which is the projected revenue for ASF furnace sales in the Business Plan.  (JA-000878).  Thus, the threshold value is set below the projected revenue in the Business Plan.

Mr. Augustine testified that GTAT had not sold ASF furnaces since September 2014, but did not testify as to how many ASF furnaces had been sold prior to September 2014, or what had been the previous average sales price.  (JA-000669).  When asked if there were any sales in the works that had not yet been booked, Mr. Augustine stated that "there's nothing that's in hand right now," but noted that there was "a lot of conversations that are taking place."  (JA-000875-76).  He further testified that ASF furnace sales are "large ticket orders" that usually involve selling from 50 to 200 furnaces at once.  (JA-000877)  Thus it appears that once a client is established, a large volume of sales would naturally follow.  *Id*.

**b.   Category 2:  Cash Operating Expense Run-Rate**

The second KEIP category is GTAT's cash operating expense run-rate.  (JA-000670-71; JA-000849-50).  Mr. Augustine stated that the target level of this category ties "directly to the 2015 projected cash operating expenses in the [B]usiness [P]lan."  (JA-000849).  Thus, the threshold value might be easily obtainable because it is set below the anticipated 2015 cash operating expenditure in the Business Plan.  Mr. Augustine provided no information on whether GTAT is on target to achieve its Business Plan projections regarding the reduction of its cash operating expense run-rate.

**c.   Category 3:  Gross Proceeds from Sale of Non-ASF Furnaces Assets at Mesa**

GTAT is winding up their manufacturing facility in Mesa, and will need to liquidate the remaining non-ASF furnace assets there.  The third KEIP category relates to the proceeds from the sale of those assets.  (JA-000748-49; JA-000850).  The minimum gross proceeds required under this category is same as the estimate of the proceeds calculated in the Business Plan.  (JA-000748-49).  An outside appraisal had been conducted on these assets, and the KEIP threshold value is met if the assets are liquidated for only 50% of the appraised value.  (JA-000749).  Mr. Augustine states in his declaration that the market for the assets are illiquid, but they have received one bid for some of the assets since filing the bankruptcy petition.  *Id.*  Mr. Augustine did not provide any indication of the value of the bid offered, or how far it would go to meeting the discounted goal of 50% of the assets' appraised worth.

**d.  Category 4:  Merlin Project**

The fourth KEIP category comprises the interlocking measures of production capacity, capital expenditures and sales revenue related to GTAT's development of a new solar industry technology, known as the Merlin Project, which has not yet been released to the market.  (JA-

000749-50, JA-000851).  As described by Mr. Augustine, the Merlin Project is "a significant growth driver" in the Business Plan, and is "expected to represent about a third of [GTAT's] business by 2018."  (JA-000851).  The target sales revenue of $28 million under this performance indicator also "ties to the Business Plan" projections.  (JA-000750).  Mr. Augustine provided no information regarding whether GTAT is on target to achieve its Business Plan projections regarding the Merlin project.

### e.   Category 5:  Crating Costs

The fifth KEIP category relates to the de-installation and crating costs for the ASF furnaces in the Mesa facility.  (JA-000673, JA-000851-52).  In his declaration, Mr. Augustine stated that the target level for this category "ties to [GTAT's] estimated de-installation and crating costs incorporated into the Business Plan."  (JA-000673).  Thus, the threshold value is set lower than the anticipated de-installation and crating costs in the Business Plan.  Mr. Augustine provided no information regarding whether GTAT is on target to achieve its Business Plan projections regarding the crating costs.

### 4.    Motivation of Proposed KEIP Participants

At various points during the hearing, the bankruptcy court asked about the motivation of the proposed KEIP beneficiaries and how the KEIP might impact them.

Early in the hearing, the bankruptcy court asked Luc Despins, GTAT's counsel, "And what if I don't approve this [KEIP]?  Does Mr. Gutierrez and Squiller and Kim and Keck and Bal, [GTAT's insiders,] do they not try to maximize sales and minimize costs?"  (JA-000789). Mr. Despins conceded that this was a good question, and that he "had the feeling" the court would ask this question.  *Id.*  He stated, "I'm not going to proffer threats or imply threats of any kind."  *Id.*  He then proceeded to note that four of the KEIP beneficiaries had engineering

degrees and three of them had Ph.D.'s.  *Id.*  He stated that they worked "in a highly technical

business" and the KEIP beneficiaries "are highly sought after."  *Id.*  He further stated, "I, as

debtors' counsel, would -- really would not like to have these people leave."  (JA-000789-790).

Although none of the KEIP beneficiaries had told Mr. Despins that they would leave if

the KEIP was not approved, he argued,"[b]ut you know, it's not a signal to them as to whether

the Committee and the creditors believe that they're the people to maximize value. And their

response, if we're not, just tell us." (JA-000790).

Mr. Despins admitted, "I don't know what they would do.  I just wouldn't want to take

that chance."  He concluded, "I think that maybe the question can be asked of Mr. Augustine,

who is our financial advisor, who deals with them on a daily basis.  He may have a better answer

than me."  (JA-000791).

During Mr. Augustine's testimony, Mr. Despins asked him the question that the

bankruptcy court had posed, asking him "what happens if the Court does not approve the KEIP

and KERP program today."  (JA-000854).  Noting that the question required him to go into his

"crystal ball," Mr. Augustine responded, "I've had conversations with members within the KEIP

and I'm not saying that if Your Honor decided not to approve the KEIP and the KERP that senior

executives would leave the [sic] mass and leave their offices and not -- tonight and not come

back tomorrow. I'm clearly not indicating that."  *Id.*

Nevertheless, Mr. Augustine admitted, "I do believe that people will begin taking phone

calls that they've been getting and thinking about them more seriously."  *Id.*  Mr. Augustine

thought that certain people within the KEIP participants "will seriously start to look," and that

this "will have a significant impact … on the business."  *Id.*  He thought that this would make it

"must more difficult not only to implement [the Business] plan, but to hold the team together."
*Id.*

The bankruptcy court later asked Mr. Augustine if he had met all of the KEIP participants.  (JA-000885).  With the exception of one insider who worked in Asia, Mr. Augustine had met all of them.  *Id*.  The bankruptcy court then asked Mr. Augustine about the work ethic of Thomas Gutierrez, GTAT's chief executive officer and a proposed KEIP participant.  *Id*.  Mr. Augustine answered overwhelmingly positively, testifying that he talked regularly with Mr. Gutierrez through the day until 10 or 11 at night, during weekends, or when Mr. Gutierrez travelled to Asia, at midnight in Mr. Gutierrez's time.  *Id*.  He described Mr. Gutierrez as "actively engaged," with a "vision" and "a strategy".  *Id*

The bankruptcy court then asked Mr. Augustine whether he believed that Mr. Gutierrez would work harder if the KEIP were adopted.  (JA-000885-86).  Mr. Augustine admitted, in essence, that if the KEIP were not adopted, some of the KEIP participants might leave GTAT. (JA-000886-87).  Specifically, the following colloquy took place:

> THE COURT: So is it your impression Mr. Gutierrez will work harder if we give him this incentive?
>
> MR. AUGUSTINE: I think he's a -- I think he's a driven individual. I think the issue is going to be if this incentive isn't there, what message does it send and does he lose some of his key lieutenants because it's not there.  That's my general view.  I can't speak for Mr. Gutierrez if he doesn't get an incentive if he decides to leave, but I do know that some of the key members of his flank will seriously consider other options because of that. And I feel it's [sic] no organization including this organization can be successful because of one individual and I think he is a great leader and a great visionary, but if he loses some of the key members of his team it's going to be very difficult to deliver on the plan.
>
> THE COURT: So is it your impression that there are members of his team, participants in the KEIP, that don't have the same level of dedication to the company that he does?

MR. AUGUSTINE: I don't think it's a question of dedication, right. I think it's a question of risk tolerance and general view of one's self-worth and one's market value and I think the general perspective is even with the KEIP their compensation is below market. With the KEIP it helps them, I think, to re-energize the process and without it, I think they're so deeply below market they start to consider other alternatives because of their own personal situation, their family situation.

*Id.*

### 5.      Bankruptcy Court Denial of KEIP and KERP

After the hearing, the bankruptcy court promptly issued its oral findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052 and 9014.  (JA-000918).  The court stated that GTAT "is a company that was formerly successful, perhaps very successful, that took a large risk that didn't pay off."  *Id*.

The court noted, "I have before me the KEIP and the KERP."  *Id.*  The court explained, "I listened very closely to the testimony of Mr. Pfeifer and Mr. Cumberland, Mr. Augustine and Mr. Newsted….." *Id.*  The court complimented the work done by GTAT and the creditors' committee in their efforts "to fashion something that they thought might work."  *Id.*

But the court continued, "[W]hat I heard every time I inquired with respect to the KEIP was how problematic it would be if the executive team -- I think at one point it was referred to as Mr. Gutierrez and his lieutenants -- left the company. It was critical to retain them."  (JA-000918-919).  The court further stated, "[I]n the absence of a statutory prohibition [like section 503(c)(1),] I could be persuaded to go along with that, but Congress has spoken very clearly on retention agreements."  (JA-000919).

The court then rendered its factual findings.  First, it found, "This is a disguised retention agreement."  *Id.*  The court found that the KEIP recipients would not work any less diligently if the KEIP were not approved or more diligently if the KEIP were approved.  *Id.*  Having found that the KEIP was a retention agreement subject to the prohibition mandated by section

503(c)(1), and because the safe-harbor conditions required under section 503(c)(1) had not been

met, the court concluded that it could not approve the KEIP.  *Id.*

With regard to the KERP proposal, the court found that the KERP recipients are

"individuals who have a very difficult decision to make."  *Id.*  The KERP recipients "need to

decide whether they will stay with the company or not."  *Id*.  If they stay, this "means that they

are investing in the company's success."  *Id.*  But "if they decide to leave, then the amount of

money that's being offered to them [in the KERP] is dramatically lower than the risk that they're

trying to avoid."  (JA-000920).  If the KERP recipients "decide that the company may fail and

they get themselves another job offer," the court found the proposed retention bonus "is not

going to keep them at the company's premises."  *Id*.  The court stated, "They're going to leave in

order to protect themselves and their families."  *Id.*  The court found that the proposed KERP

payment would make no difference whatsoever to the KERP recipients' willingness to remain

the company's employ.  *Id.*  It thus concluded that the KERP "falls below the business judgment

standard."  *Id.*

In light of its factual findings and legal conclusions, the court denied GTAT's motion to

adopt the KEIP and KERP.  *Id*.  This appeal followed.

## SUMMARY OF ARGUMENT

1.      GTAT is a technology company that took a large business risk in attempting to enter a

supply relationship with Apple Company, a risk that did not pay off.  Instead, the company

entered chapter 11 reorganization, suffered over $300 million in post-petition losses, and laid off

over 70% of its workforce.  Their share price has plummeted, and the company is in dire

financial straits.

Despite its financial condition, the company has proposed to adopt bonus payment plans

for a group of insiders and a separate group of "key employees."  These bonuses would be paid

on the earlier of either the end of the reorganization or the sale of all or substantially all of GTAT's assets.

2.      In 2005, Congress enacted the Reform Act to prevent bankrupt companies from rewarding its insiders with enticements to stay with the company through the reorganization process.  11 U.S.C. § 503(c)(1).  This law followed a number of controversial cases like Enron and WorldCom, in which executives whose own mismanagement had led the company to lay off thousands of employees and file for bankruptcy, were lavishly paid to remain through reorganization.  Congress explicitly mandated that bankrupt companies may no longer pay to encourage its insiders to remain with the company, absent the satisfaction of some very challenging statutory conditions, which no one suggests are met here.

Despite the Reform Act's prohibitions, GTAT has tried to provide nine insiders with additional compensation under the guise of an "incentive" program, or KEIP.  Ironically, part of GTAT's rationale to pay bonuses to the insiders is because the company's share price has dropped so precipitously under current management that the equity component of the insiders' compensation is virtually worthless.

Despite GTAT's label of "incentive" program for its proposed insider bonuses, the bankruptcy court found that GTAT had proposed the KEIP with the intention of discouraging its insiders from seeking positions elsewhere.  The bankruptcy court thus found that the proposed KEIP was in fact a retention plan in disguise, which Congress had prohibited.  This finding was not clearly erroneous because despite direct questions from the court as to whether the KEIP would incentivize the insiders to work harder, neither GTAT's witness nor attorney could testify that it would.  Further, they admitted that that they feared if the KEIP were not adopted, the insiders would leave.  Because GTAT proposed the KEIP for the purpose of inducing the

insiders to remain with GTAT, it was prohibited under section 503(c)(1).  Therefore, the bankruptcy court properly denied the KEIP.

3.      In the Reform Act, Congress also mandated that any payment not made in the ordinary course of business, such as GTAT's proposed retention bonuses to the 26 "key" employees under the KERP, must be justified under the facts and circumstances of the case.  11 U.S.C. § 503(c)(3).  The bankruptcy court is entrusted under this standard with the duty to determine whether the proposed payment is so justified.

        Contrary to GTAT's suggestion that a debtor, through the exercise of business judgment, gets to determine whether its own plan satisfies section 503(c)(3), recent Supreme Court precedent indicates that a bankruptcy court may not abdicate its fact-finding duties.  GTAT wishes to act as the judge and jury of the propriety of its own plan.  But there is no mention of deference to a debtor's business judgment in the statutory language.  In arguing that its own business judgment should trump the bankruptcy court's analysis, GTAT is attempting to transform a statutory prohibition on debtor conduct into a safe harbor for debtors to act as they wish.  The bankruptcy court below appropriately exercised its fact-finding role in assessing the KERP.

        With regard to the non-insider retention bonuses in the proposed KERP, the bankruptcy court reviewed the plan and weighed the testimony of GTAT's witnesses.  The court assessed the record of employees who had left the company since GTAT started experiencing financial difficulties, and reviewed the proposed amount of the retention bonuses in light of the risks that GTAT's employees faced in staying. The court found that the proposed payments were too low to make a difference to an employee who was wary of GTAT's precarious financial condition and who was given another job offer.  The court found that if a KERP participant were to decide

22

to search elsewhere for a new job, the proposed payments would not induce that employee to stay through the reorganization.  If the KERP participant decided to stay, it was because they were investing in GTAT's success.

Given the evidence and witness testimony, it was not clear error for the bankruptcy court to find that the proposed payments were not justified under the facts and circumstances of this case.  The bankruptcy court did not abuse its discretion in denying the KERP, as it was authorized to do under section 503(c)(3).

**ARGUMENT**

**I.      The Bankruptcy Court Did Not Clearly Err in Denying Debtors' KEIP**

   **A.  The Bankruptcy Court Applied the Proper Standard Under Section 503(c)(1)**

Section 503(c) was enacted in 2005 as part of the Reform Act to respond to "glaring abuses of the bankruptcy system by the executives of giant companies like Enron Corp, and WorldCom Inc. and Polaroid Corporation, who lined their own pockets but left thousands of employees and retirees out in the cold." (Floor Statement, quoted in *In re Dana Corp.,* 358 B.R. 567, 575 (Bankr. S.D.N.Y. 2006)).  The abuses at which the provision is aimed regularly manifest themselves in the guise of insider retention plans. See 3 COLLIER ON BANKRUPTCY ¶ 503.17[1] at 503-105 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2013) (section 503(c)'s "purpose was to limit the scope of … programs providing incentives to management of the debtor  as a means of inducing management to remain employed by the debtor.").

   As one court has explained:

> All too often [insider retention plans] have been used to lavishly reward -- at the expense of the creditor body -- the very executives whose bad decisions or lack of foresight were responsible for the debtor's financial plight. But even where external circumstances rather than the executives are to blame, there is something inherently unseemly in the effort to insulate executives from the financial risks all other stakeholders face in the bankruptcy process.

23

*In re U.S. Airways, Inc.*, 329 B.R. 793, 797 (Bankr. E.D. Va. 2005).  Congress determined that

section 503(c) was necessary "to limit a debtor's ability to favor powerful insiders economically

and at estate expense during a chapter 11 case."  *In re Pilgrim's Pride Corp.*, 401 B.R. 229, 234

(Bankr. N.D. Tex. 2009).

      Section 503(c)(1) applies to "a transfer made to, or an obligation incurred for the benefit

of, an insider . . . for the purpose of inducing such person to remain with the debtor's

business…." 11 § U.S.C. 503(c)(1).  Accordingly, a bankruptcy court must determine whether a

proposed insider payment plan was made "for the purpose" of inducing the insider to remain

with the debtor.  *Id.*  Simply labelling a bonus payment plan as an "incentive" plan is insufficient

to avoid court inquiry into whether the plan is prohibited under section 503(c)(1).  *In re Velo*

*Holdings Inc.*, 472 B.R. 201, 209 (Bankr. S.D.N.Y. 2012).  "Attempts to characterize what are

essentially prohibited retention programs as 'incentive' programs in order to bypass the

requirements of section 503(c)(1) are looked upon with disfavor, as the courts consider the

circumstances under which particular proposals are made, along with the structure of the

compensation packages, when determining whether the compensation programs are subject to

section 503(c)(1)."  *Id.*[7]

      In reviewing proposed insider incentive bonus plans, courts often consider the difficulty

of achieving the proposed target goals.  *See, e.g, In re Hawker Beechcraft, Inc.*, 479 B.R. 308,

313 (S.D.N.Y. 2012) (court must determine whether proposed targets "are designed to motivate

---

[7] Careful judicial review of proposed incentive plans for disguised retention plans is consistent
with the clear congressional mandate to prevent insolvent companies from rewarding its insiders
with retention bonuses.  *See Grassley Probes DOJ for Policies on KERPs*, 31-2 AM. BANKR.
INST. J. 8 (March 2012) (in response to *Wall Street Journal* report that companies in chapter 11
continue to pay bonuses to top executives in form of "incentive" plans, Senator Grassley, chief
Senate sponsor of the Reform Act, looks into whether companies are "masking retention plans
under the guise of incentive plans, in conflict with Congressional intent").

insiders to rise to a challenge or merely report to work").  Where targets of incentive plans have

been deemed to be too easily attainable, such plans have been held to be retention plans in

disguise.  *See id*. at 313-15 (denying KEIP as disguised retention plan where lowest incentivizing

levels were "well within reach")  .

However, nothing in the statute limits the bankruptcy court's review to just the objective

features of the proposed plan.  The bankruptcy court has discretion to view other evidence,

including testimony of debtor's witnesses, to determine whether a debtor proposed a bonus

payment plan for the purpose of inducing its insiders to remain with the debtor.  *See Hawker*

*Beechcraft,* 479 B.R at 314.  In *Hawker Beechcraft*, the debtor's chief executive officer had

testified that without the proposed incentive plan, his senior management "could seek alternative

employment opportunities" which would undermine their attempt to restructure under chapter

11.  *Id.*  The court found that this testimony "confirmed the retentive purpose" of the proposed

incentive plan.  *Id*.

The proponent of a purported 'incentive' plan bears the burden of proving that the

proposed plan is not a retention plan governed by section 503(c)(1).  *Hawker Beechcraft,* 479

B.R at 313.  If the debtors fail to meet their burden of proof, and the conditions under section

503(c)(1) are not met,[8] the KEIP cannot be approved.

**B.      The Bankruptcy Court Did Not Clearly Err in Finding That Debtors' KEIP Was
a Retention Plan**

GTAT cannot show that the bankruptcy court clearly erred in denying its motion for the

KEIP.  The record firmly supports the bankruptcy court's findings that GTAT had proposed the

---

[8]  GTAT has not attempted to qualify its KEIP under section 503(c)(1).  Counsel for GTAT
represented to the bankruptcy court that GTAT would not be able to satisfy the conditions set
forth in section 503(c)(1).   (JA-000772).

KEIP in order to retain the KEIP participants, contrary to GTAT's representations that payments under the KEIP were intended as incentive payments.

"Incentive" is defined as "something that incites or has a tendency to incite to determination or action." *Velo Holdings, Inc.*, 472 B.R.at 211 (citing WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 608 (9th ed. 1984)).  Thus, an "incentive" bonus is one that would incite an employee to work harder or achieve a particular goal.  In determining whether the proposed KEIP payments would incentivize the proposed participants,  the bankruptcy court logically asked whether the KEIP participants would work harder if the plan were approved, or less hard if the court denied the plan.  This is exactly the inquiry that the bankruptcy court should undertake to fulfill its duty in ensuring the debtor's compliance with section 503(c).

In this instance, despite direct questioning from the court, neither GTAT's counsel nor Mr. Augustine could state that they believed the KEIP payments would encourage the KEIP participants to work harder.  (JA-000789-791; JA-000854; JA-000886-87).  Indeed, it is clear from Mr. Augustine's testimony that he believed GTAT's chief executive officer was a driven individual who would work hard regardless of any incentive plan.  (JA-000885).  Both Mr. Despins and Mr. Augustine's responses to the court's inquiries regarding the effects of not adopting a KEIP centered entirely on a fear that if the KEIP were not adopted, the proposed KEIP participants would leave the company.  (JA-000789-791; JA-000854; JA-000886-87); *see supra*, pp. 16-19.  Yet this is precisely what section 503(c)(1) prohibits: senior management giving itself and other insiders bonuses for staying that are not equally available to all employees.

Mr. Augustine conceded that the impact of failing to adopt a KEIP for the nine insiders was retentive.  Without a KEIP in place, Mr. Augustine testified that the KEIP participants

would "start to consider other alternatives because of their own personal situation, their family situation." (JA-000887). In other words, GTAT wanted to adopt the KEIP because if it did not, the insiders might leave the company. As in *Hawker Beechcraft*, 479 B.R at 314, this testimony confirms the bankruptcy court's finding in this case that GTAT proposed the KEIP for retentive purposes. As such, the bankruptcy court did not clear err in finding that the KEIP was precluded under section 503(c)(1). (JA-000918-919).

Moreover, and contrary to GTAT's assertions, the record is *not* clear that the KEIP was designed to incentivize the KEIP participants "to expend maximum levels of effort." (App. Br. at 27). The target values set in four of the five KEIP categories merely require GTAT to achieve the same goals as those it had already set within its Business Plan.[9] *See supra*, pp. 14-16 ((1) target level of ASF furnace sales is projected level in Business Plan (JA-000878); (2) target cash operating expense run-rate ties to Business Plan (JA-000849); (3) target sales revenue for Merlin project ties to Business Plan (JA-000750); and (4) target level of crating costs ties to estimated costs in Business Plan (JA-000750).) Because the *target* levels of the KEIP categories are the same as the projected targets of the Business Plan, the *threshold* level KEIP bonuses would be paid even if GTAT falls short of its own projections, as long as the lower threshold level is met. *Id*.; (JA-001275-1281-Filed Under Seal) (setting forth KEIP bonus determination).

Even though there will always be some uncertainty in achieving the company's own projections, as noted in *Hawker Beechcraft*, a bankruptcy court certainly may find that these uncertainties "were taken into account when the predictions were made by the Debtors' sophisticated financial employees and professionals." 479 B.R. at 314 n.8. GTAT designed its

---

[9] The third KEIP category of gross proceeds from sale of non-ASF furnace assets at Mesa is not more challenging than the others; it sets the threshold level to be the same as the projections in the Business Plan, which is only 50% of the assets' appraised value. (JA-000748-49).

Business Plan, and then designed the KEIP to reward insiders with bonuses for achieving lower

targets. Consequently, GTAT failed to meet their burden of proof that the performance

requirements were sufficiently challenging. *Hawker Beechcraft*, 479 B.R. at 313 n.7 (noting that

although the targets may not be "lay-ups," they were more like free throws than half court flings

at the buzzer).

 The record thus confirms that the bankruptcy court did not commit clear error in finding

that the KEIP was in fact a retention plan prohibited by section 503(c)(1). As the record reflects,

GTAT did not bear its burden in proving that section 503(c)(1) did not apply, and the bankruptcy

court properly denied GTAT's motion to adopt the KEIP.

## II.  The Bankruptcy Court Did Not Clearly Err in Denying Debtors' KERP

### A.  The Bankruptcy Court Properly Conducted An Independent Analysis of the KERP

#### 1.  Under Section 503(c)(3), the Bankruptcy Court Must Find that Payments Out of the Ordinary Course of Business Are Justified By the Facts and Circumstances of the Case

 The plain meaning of the statutory language of section 503(c)(3) is clear. "[W]hen the

statute's language is plain, the sole function of the courts--at least where the disposition required

by the text is not absurd--is to enforce it according to its terms". *See Lamie v. United States*

*Trustee*, 540 U.S. 526, 534 (2004). The 2005 Reform Act mandated that "there shall neither be

allowed, nor paid," transfers or obligations that are (1) "outside the ordinary course of business"

and (2) "not justified by the facts and circumstances of the case." 11 U.S.C. § 503(c)(3). The

statutory text squarely places a duty on the bankruptcy court to determine whether a proposed

transfer is justified by the case's facts and circumstances.

 This is consistent with the Supreme Court's holding in *United Student Aid Funds, Inc. v.*

*Espinosa*, 559 U.S. 260, 277 (2010) that a bankruptcy court has an independent obligation to

determine whether a proposed chapter 13 plan complies with the Bankruptcy Code.  There, the

Supreme Court reviewed the language provided in 11 U.S.C. § 1325(a)(1), which provides, in

relevant part, that "the court shall confirm a plan if … the plan complies with the provisions of

this chapter and with the other applicable provisions of this title…."  The Supreme Court held

that this provision dictated that a court may confirm a chapter 13 plan only if the court found that

the plan complied with the applicable provisions of the Bankruptcy Code.  *Id.* at 277.  The

Supreme Court held that the statute placed an independent duty upon the bankruptcy court to

determine if a proposed chapter 13 plan had any defects, even absent objections.  *Id*.  *Espinosa*

firmly establishes that that a bankruptcy court may not abdicate its fact-finding duties.  *Id.*

Similarly, the text of section 503(c)(3) places a fact-finding duty upon the bankruptcy court to

determine whether a payment outside the ordinary course of business was justified.

Prior to 2005, executive bonuses that were outside the ordinary course of business were

approved pursuant to the more permissive standard of section 363(b).  *See, e.g., Montgomery*

*Ward Holding Corp.*, 242 B.R. at 152-53.  The statutory language of section 363(b) provides in

relevant part:  "The trustee, after notice and a hearing, may use, sell, or lease, other than in the

ordinary course of business, property of the estate…." 11 U.S.C. § 363(b)(1) (emphasis added).

In adopting section 503(c) as part of the Reform Act, Congress expressly moved away

from the general permissive standard of section 363(b) towards a more specific statutory

prohibition of bonus payments absent factual findings of justification by the bankruptcy court.

11 U.S.C. §503(c)(3).  The Supreme Court has held that it is a "well established canon of

statutory interpretation" that "the specific governs the general."  *RadLAX Gateway Hotel, LLC v.*

*Amalgamated Bank*, 132 S. Ct. 2065, 2070-2071 (2012) (citations omitted).  This canon may be

applied to statutes where "a general authorization and a more limited, specific authorization exist

side-by-side." *Id.*  This canon of statutory interpretation avoids "the superfluity of a specific provision that is swallowed by the general one, violating the cardinal rule that, if possible, effect shall be given to every clause and part of a statute." *Id.* (citations omitted).

To continue to apply the section 363(b) standard to "outside the ordinary course" bonus payment plans after Congress adopted the Reform Act, as GTAT urges this Court (App. Br. at 6), would improperly render section 503(c) meaningless. *Pilgrim's Pride Corp.*, 401 B.R.at  236-37.  The court in *Pilgrim's Pride* expressly disagreed with bankruptcy court cases, such as those cited by GTAT (App. Br. at 6), that had concluded that the standard under section 503(c)(3) was no different than under section 363(b). *Id.*  "Congress is presumed to intend that independent sections of the Code will have independent, differing impacts." *Id.* (citing *BFP v. Resolution Trust, Corp.*, 511 U.S. 531, 537 (1994)).  "To read section 503(c)(3) as requiring nothing not already required by section 363(b)(1) would violate this principle of construction." *Id.*; 4 COLLIER ON BANKRUPTCY ¶ 503.17[4] at 503-112 (finding persuasive the *Pilgrim's Pride* court's "sound reasons" for imposing a stricter standard under section 503(c)(3) than section 363(b)(1)).

Pursuant to section 503(c)(3)'s command, the bankruptcy court properly made an independent determination whether GTAT's proposed KERP was justified by the facts and circumstances.

### 2.   Independent Analysis By the Bankruptcy Court Is Proper Under the Section 363(b) "Sound Business Judgment" Test

In the alternative, even if GTAT's KERP were assessed under the superseded section 363(b) standard, this standard also required the bankruptcy court to make an independent assessment of the proposed payment plan.

The current language for section 363(b)(1) was adopted in 1978, and in a departure from its statutory predecessors, it contained no reference to requiring a debtor-in-possession or trustee

to show "cause" for the transaction.  *In re The Lionel Corp.*, 722 F.2d 1063, 1069 (2d Cir. 1983).

Despite the lack of any apparent statutory limits to permitting "out of ordinary transactions," the

Second Circuit Court of Appeals determined that bankruptcy courts do not have "unfettered

discretion" to authorize these transactions.  *Id*.  Instead, the Second Circuit adopted a rule that

"requires that *a judge* determining a section 363(b) application expressly find from the evidence

presented before him at the hearing a *good business reason* to grant such an application."  *Id.* at

1071 (emphasis added).

　　In so doing, the Second Circuit relied on the policies underlying the 1978 amendment,

balancing (a) the need to permit the bankruptcy judge "substantial freedom to tailor his orders to

meet differing circumstances" with (b) the safeguards of chapter 11 and the procedural

protections of a "notice and hearing," which would be rendered "meaningless absent a further

requirement that reasons be given for whatever determination is made."  *Id*. at 1069.  This test

has developed into what is known as the "sound business judgment" test.  3 COLLIER ON

BANKRUPTCY ¶ 363.02[4] at 363-18.

　　As the leading bankruptcy treatise explains, this test "differs from the general corporate

law business judgment rule, which protects corporate directors from liability where they

exercised due care and were not self-interested in the transaction."  *Id.* at 363-19.  Instead, under

the "sound business judgment" test, "the bankruptcy court reviews the trustee's (or debtor in

possession's) business judgment to determine *independently* whether the judgment is a

reasonable one."  *Id.* (emphasis added).  Although the court "should not substitute its judgment

for the trustee's," *id.*, contrary to GTAT's assertions, the "sound business judgment test" does

not presume that the court must defer to the business judgment of the debtor-in-possession, but

instead requires that the bankruptcy judge "articulate sound business justification for his decisions," *Lionel Corp.*, 722 F.2d at 1066.

The bankruptcy court in *In re Dana Corp.* implicitly recognized the independent nature of the bankruptcy court's role in assessing whether a proposed bonus payment plan met the "sound business judgment" test, by listing a number of factors for the court to consider when entertaining the debtor's motion. *In re Dana Corp.*, 358 B.R. 567, 576 (Bankr. S.D.N.Y. 2006). The first factor that the *Dana* court listed for the court to determine was whether there was "a reasonable relationship between the plan proposed and the results to be obtained." *Id.*

In other words, the *Dana* court asked, "[W]ill the key employee stay for as long as it takes for the debtor to reorganize or market its assets?" *Id.*[10] It was this first question among the *Dana* factors for the "sound business judgment" test that the bankruptcy court below considered and answered in denying GTAT's proposed KERP.[11] Consequently, even if the "sound business judgment" test under section 363(b)(1) were to apply to GTAT's motion, the bankruptcy court properly made an independent determination as to whether the KERP was supported by sound business reasons, and thus applied the correct legal standard.

---

[10]   Regarding this first factor, the *Dana* court also asked "in the case of a performance incentive, is the plan calculated to achieve the desired performance?" 358 B.R. at 576. Here, the bankruptcy court explicitly determined that the proposed KEIP would not incite the insiders to work harder. (JA-000919). Thus, even if GTAT's KEIP were not prohibited under section 503(c)(1), it would not pass muster under a section 503(c)(3) or section 363(b) standard, and was properly denied.

[11]   The other *Dana* factors include: (a) whether the cost of the plan is reasonable in the context of the debtor's assets, liabilities and earning potential; (b) whether the scope of the plan was "fair and reasonable," or did it discriminate among employees unfairly; (c) whether the plan was "consistent with industry standards; (d) what due diligence efforts were taken by the debtor in investigating the need for a plan; and (e) whether the debtor received "independent counsel in performing due diligence and in creating and authorizing the incentive compensation." *Dana Corp.*, 358 B.R. at 576-577.

GTAT incorrectly asserts that bankruptcy courts must defer to debtors' business judgment in assessing its proposed bonus payment plans. (App. Br. at 20-21). The cases on which it relies are inapposite. Both *Lubrizol Enterprises* and *Logical Software* involved motions to reject an executory contract that were brought under 11 U.S.C. § 365(a), a completely different statutory provision that is not applicable to GTAT's denied motion. [12]  *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1045 (4th Cir. 1985); *In re Logical Software*, 66 B.R. 683, 686 (Bankr. D. Mass. 1986)). *Aerovox*, which approved a proposed retention plan under section 363(b), referred in passing to a court's deference to a debtor's business judgment, but in fact analyzed the proposed plan under a "fair and reasonable" standard, another form of the "sound business judgment" test. *In re Aerovox*, 269 B.R. 74, 80 (Bankr. D. Mass. 2001); 3 Collier on Bankruptcy ¶ 363.02[4] (standards to approve section 363(b) sales have various names but are essentially the same test). Moreover, *Aerovox* was decided in 2001, prior to the 2005 Reform Act; the court never needed to apply the new statutory language of section 503(c). [13]

There is no room under the text of section 503(c) for the level of deference that GTAT seeks from the bankruptcy court. The bankruptcy court acted wholly appropriately in declining

---

[12]   The text of each provision shows a stark contrast in the applicable standards; unlike the default prohibition set out under section 503(c), which dictates that "there shall neither be allowed, nor paid" the identified transfers, 11 U.S.C. § 503(c), section 365(a) is permissive, providing that "the trustee, subject to the court's approval, may assume or reject any executory contract…" 11 U.S.C. § 365(a). Section 365(a) applies only to contracts in existence at the commencement of the case. 3 Collier on Bankruptcy, ¶ 365.02[2][e] at 365-20. GTAT's KEIP and KERPs are post-petition proposals, and are simply not governed by section 365(a).

[13]   *In re United Healthcare Sys., Inc.*, No. 97-1159, 1997 WL 176574 (D.N.J. Mar. 26, 1997), also cited by GTAT, similarly pre-dated the Reform Act. Further, it did not mandate deference to a debtor's corporate judgment, but instead required the bankruptcy court to consider the "complex and difficult interrelation between public health care and bankruptcy." *Id.* at *1. No such complex factors exist here.

to allow GTAT to decide for itself whether it had satisfied section 503(c)(3).  That is the job of the courts, not the parties.

**B.      The Bankruptcy Court Did Not Clearly Err In Finding That Debtors' KERP Would Be Ineffective**

GTAT cannot show that the bankruptcy court abused its discretion in denying its motion for the KERP.  Under section 503(c)(3), the record shows that the bankruptcy court was within its discretion to deny the motion.

As found by the court, prior to filing for bankruptcy, GTAT "took a large risk that didn't pay off." (JA-000918).  Since filing its bankruptcy petition, GTAT has laid off 820 employees and suffered losses of 310 million dollars.  (JA-000796, JA-000871).  Under its pre-existing management incentive plan, potential bonus payments ranged anywhere from 10% to 125% of the recipient's salary.  (JA-000809).  Yet, even though employees were aware of the possibilities of receiving performance bonuses under the management incentive plan, its existence had not prevented people from resigning.  (JA-000800).

The proposed KERP bonuses for the 26 purported non-insider participants ranged from 8% to 48% of the employees' base salaries.  (JA-000548-49).  Mr. Pfeifer, GTAT's director of compensation, testified that when other employees informed him that they had been presented with other job opportunities, he had advised them "to do what's best for them" because "you need to take care of yourself and your family first." (JA-000809).  The court asked Mr. Pfeifer, a proposed KERP participant, if he were to receive an offer for "another job that pays as much or more," whether his participation in the KERP would change his approach.  (JA-000815-16).  Mr. Pfeifer, GTAT's witness whose main purpose was to convince the court of the necessity of the KERP, did not state "yes."  Instead, Mr. Pfeifer hedged, "It certainly gives me pause." (JA-000816).   The bankruptcy court, as fact-finder, made a determination that this testimony

indicated that the KERP payment would not, in fact, change Mr. Pfeifer's approach.  Pursuant to the standard of review for assessing the credibility of witnesses, the bankruptcy court's factual findings must be accorded deference.  *In re The Bible Speaks*, 869 F.2d at 629-630.

The record supports the court's finding and conclusions that the amount of money offered to the KERP participants was simply too low to keep them with GTAT in the event they received other offers.   (JA-000920).  As Mr. Cumberland himself advised the employees that they should consider leaving GTAT, the court concluded that the employees would "leave in order to protect themselves and their families," and the KERP would not prevent this.  *Id.*  Because the court found that the proposed KERP payments would make no meaningful difference to the 26 KERP beneficiaries' willingness to remain in the company's employ, the KERP was not justified under the facts and circumstances as required under section 503(c)(3).  Even under the superseded section 363(b) standard, the court had grounds to conclude that the KERP failed to satisfy the first *Dana* factor of whether there was a reasonable relationship between the plan proposed and the results to be obtained; the court found that there was not.  *Id.*

In light of its factual findings, the bankruptcy court properly denied the proposed KERP. GTAT has not shown that the bankruptcy court abused its discretion.

## CONCLUSION

For these reasons, the United States Trustee respectfully asks this Court to affirm the

order entered below.

Respectfully submitted,

WILLIAM K. HARRINGTON
UNITED STATES TRUSTEE,
REGION 1

By:    */s/ Eric K. Bradford*
Eric K. Bradford BBO#560231
Trial Attorney
Department of Justice
John W. McCormack Post Office & Courthouse
5 Post Office Square, 10th Floor, Suite 1000
Boston, MA 02109-3934
PHONE:        (617) 788-0415
FAX:          (617) 565-6368
Eric.K.Bradford@USDOJ.gov

Dated: May 5, 2015

RAMONA D. ELLIOTT
Deputy Director/General Counsel
P. MATTHEW SUTKO
Associate General Counsel
SUMI K. SAKATA
Trial Attorney
Department of Justice
Executive Office for U.S. Trustees
441 G St., NW
Washington, DC  20530
(202) 616-0127

GERALDINE L. KARONIS
Assistant United States Trustee
ANN MARIE DIRSA
Trial Attorney
Department of Justice
1000 Elm Street, Suite 605
Manchester, NH 03101

## CERTIFICATE OF SERVICE

I certify that on May 5, 2015, I transmitted copies of the foregoing brief by CM/ECF to all persons who have filed a notice of appearance in the Court's CM/ECF database, including the persons identified below.

WILLIAM K. HARRINGTON
UNITED STATES TRUSTEE,
REGION 1

By:    */s/ Eric K. Bradford*
Eric K. Bradford BBO#560231
Trial Attorney
Department of Justice
John W. McCormack Post Office & Courthouse
5 Post Office Square, 10th Floor, Suite 1000
Boston, MA 02109-3934
PHONE:        (617) 788-0415
FAX:            (617) 565-6368
Eric.K.Bradford@USDOJ.gov

Dated: May 5, 2015

Jason R. Adams
Holly J. Barcroft
James S. Carr
Luc A. Despins
Philip C. Dublin
Jeremy R. Fischer
Steven E. Grill
James T. Grogan
Brad M. Kahn
Benjamin Marcus
Charles R. Powell, III
Abid Qureshi
Daniel W. Sklar
Michael S. Stamer
Andrew V. Tenzer
Robert E. Winter