## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

GT Advanced Technologies Inc.,
et al.
     Appellants

    v.                                              Civil No. 15-cv-069-LM
                                          Opinion No. 2015 DNH 144
William K. Harrington, United
States Trustee
     Appellee

### O R D E R

Chapter 11 debtor GT Advanced Technologies, Inc. and its affiliated debtors and debtors in possession (collectively "GTAT") appeal a February 5, 2015 order of the bankruptcy court (Boroff, J.) denying their motion for approval of a proposed key employee retention plan and a proposed key employee incentive plan. Appellee William Harrington is the United States Trustee ("Trustee"). This court heard oral argument on GTAT's appeal on July 10, 2015. For the reasons that follow, this matter is remanded to the bankruptcy court for further proceedings.

### I. Standard of Review

This court has jurisdiction over GTAT's appeal pursuant to 28 U.S.C. § 158(a). "The bankruptcy court's legal conclusions engender de novo review, but its factual findings are examined only for clear error." Redondo Constr. Corp. v. P.R. Highway & Transp. Auth. (In re Redondo Constr. Corp.), 678 F.3d 115, 120-

21 (1st Cir. 2012) (citing Donarumo v. Furlong (In re Furlong), 660 F.3d 81, 86 (1st Cir. 2011)).

Until 2014, the Federal Rules of Bankruptcy Procedure ("Federal Rules") provided that a district court reviewing an appeal from a decision of the bankruptcy court was "authorized to 'affirm, modify, or reverse a bankruptcy judge's [order] or remand with instructions for further proceedings.'" Quinn v. Quinn, 528 B.R. 203, 205 (D. Mass. 2015) (quoting Fed. R. Bankr. P. 8013).  The 2014 revisions to the Federal Rules eliminated the provision cited in Quinn.  See 10 Collier on Bankruptcy ¶ 8000.01, at 8000-3 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).  Even so, the court has no reason to believe that its tools for disposing of bankruptcy appeals are any different from those described in the pre-2014 iteration of Rule 8013.

## II. Background

GTAT is a technology company that once produced sapphire glass.  As a result of a cash liquidity crisis arising from its sapphire glass manufacturing operation, GTAT petitioned for protection under Chapter 11 of the Bankruptcy Code.  At the time, it had assets of over one billion dollars.  Shortly after filing its petition, GTAT suffered losses of more than 300 million dollars and laid off 820 employees, nearly 70 percent of its workforce.  In addition to implementing layoffs, GTAT lost

2

another 43 employees to voluntary attrition between the time it filed its bankruptcy petition and the date of the bankruptcy court's hearing on its motion for approval of the proposed incentive and retention plans.  Among the key points of GTAT's plan for reorganization are: (1) shifting away from the manufacture of sapphire glass; (2) selling the furnaces it had previously used to manufacture sapphire glass at a facility in Mesa, Arizona; and (3) developing and manufacturing new products in the solar industry through two projects named "Merlin" and "Hyperion."

Less than three months after filing for bankruptcy protection, GTAT moved the bankruptcy court to approve: (1) a key employee incentive plan ("KEIP") that would provide bonuses for nine insiders; and (2) a key employee retention plan ("KERP") that would provide bonuses for about two dozen non-insider employees.  The final versions of the KEIP and the KERP were developed on the basis of extensive negotiations with the Creditors' Committee.

The proposed KEIP covers nine senior management employees. The amount of any employee's bonus under the KEIP is based upon his or her performance in five specific areas.  The operative metrics are: (1) maximizing the value received for GTAT's used furnaces; (2) reducing "cash operating expense run-rate," Appellants' Br. (doc. no. 17) 9; Appellee's Br. (doc. no. 22) 7;

3

(3) maximizing the value received for assets from the Mesa facility other than furnaces; (4) advancing the Merlin project; and (5) minimizing the costs of deinstalling furnaces at the Mesa facility.  Performance in each of those five metrics is measured on a scale that runs from "threshold" through "target" to "stretch."  An individual who meets the "target" standard in each of the five metrics would receive a bonus of between 19 percent and 83 percent of his or her base salary.  The total cost of the KEIP runs from $1,137,500, if each insider meets the "threshold" standard in each of the five metrics, to $3,370,000, if each insider meets the "stretch" standard in each of the five metrics.

The proposed KERP covers 26 employees.  The retention bonuses in the KERP are to be paid to employees who remain with GTAT until the earlier of its emergence from bankruptcy or a sale of substantially all of its assets.  The bonuses range from eight percent to 48 percent of an employee's base salary, and the KERP also provides for discretionary disbursements by GTAT's chief executive officer, up to a total of $300,000, with no more than $50,000 going to any individual KERP participant.  If all the proposed bonuses are paid, the KERP will cost GTAT $1,250,000.

The bankruptcy court held a hearing on GTAT's motion for approval of its KEIP and KERP.  Only two objections were filed,

4

one by the Trustee and one by a shareholder.  At the hearing,
the bankruptcy court heard testimony from: Andrew Pfeifer[1] and
Brian Cumberland,[2] and had before it declarations from those two
witnesses as well as declarations from Neil Augustine[3] and
Richard Newsted.[4]  At the conclusion of the hearing, the court
ruled from the bench.  With regard to the KEIP, Judge Boroff had
this to say:

> I have before me the KEIP and the KERP.  I
> listened very closely to the testimony of Mr. Pfeifer
> and Mr. Cumberland, Mr. Augustine and Mr. Newsted, as
> well as the impressive work that was done by them and
> by the Creditors' Committee, its professionals and
> counsel for the debtor in order to fashion something
> that they thought might work.
>
> Nevertheless, what I heard every time I inquired
> with respect to the KEIP was how problematic it would
> be if the executive team – I think at one point it was
> referred to as Mr. Gutierrez and his lieutenants –
> left the company.  It was critical to retain them.
>
> Well, in the absence of a statutory prohibition I
> could be persuaded to go along with that, but Congress

---

[1] Pfeifer is "the Senior Director of Corporate Compensation
and Benefits at GT."  J.A. (doc. no. 18), at JA-000627.

[2] Cumberland is "the National Managing Director of the
Compensation & Benefits practice at Alvarez & Marsal Taxand, LLC
. . ., the tax consulting practice of Alvarez and Marsal North
America, LLC."  J.A., at JA-000635.

[3] Augustine is "an Executive Vice Chairman of Rothschild
Inc."  J.A., at JA-000662.  Rothschild "provided extensive pre-
petition services to [GT] in preparation for [its] restructuring
efforts."  Id. at JA-000664.

[4] Newsted is "an independent member of the Board of
Directors of GT . . . (the 'Board'), and . . . a member of the
Restructuring Committee of the Board."  J.A., at JA-000615.

has spoken very clearly on retention agreements [for
insiders]. This is a disguised retention agreement.
I do not believe that Mr. Gutierrez or his so-called
lieutenants are going to work any less diligently if I
don't approve the agreement or any more diligently if
I do approve the KEIP agreement. They will leave the
company or stay with the company based on their
expectation that the company will survive and how well
it will do in its reorganized form.

Retention agreements [for insiders], Mr. Despins
said at the outset, have been made extraordinarily
difficult – he might have said impossible and I might
agree with him – by Section 503(c) of the Bankruptcy
Code and the elements of 503(c)(1) . . . have simply
not been met and so I cannot approve the KEIP
agreement.

J.A. (doc. no. 18), at JA-000918-000919. Judge Boroff also

declined to approve the KERP:

With respect to the KERP plan, those are
individuals who have a very difficult decision to
make. They need to decide whether they will stay with
the company or not. To stay with the company means
that they are investing in the company's success and
if they decide to leave, then the amount of money
that's being offered to them is dramatically lower
than the risk that they're trying to avoid. If, in
fact, they think that the company will fail – and I've
every expectation that they're still there because
they anticipated success – but if they change their
mind[s] and decide that the company may fail and they
get themselves another job offer, then it seems to me
that the . . . retention payment . . . is not going to
keep them at the company's premises. They're going to
leave in order to protect themselves and their
families.

Id. at JA-000919-000920. The judge concluded his ruling this

way:

And so really, we're talking about the KEIP or
the KERP. I believe that the various proposed
participants all – have already . . . sufficient

6

incentive or disincentive to stay and the payments
proposed are going to make no difference whatsoever
either as to their performance or as to their
willingness to remain in the company's . . . employ.

Accordingly, I find [and] I rule . . . that while
the KEIP simply doesn't satisfy the statute because it
is [a] disguised retention program [and] the KERP
falls below the business judgment standard.
Accordingly, I will deny both motions.

Id. at JA-000920.

### III. Discussion

On appeal, GTAT argues that the bankruptcy court erred by:
(1) applying the wrong legal standard to its consideration of
the KEIP; and (2) improperly substituting its own business
judgment for that of GTAT when assessing both the KEIP and the
KERP.  This court considers each plan in turn.

#### A. Key Employee Incentive Plan

With respect to approval of the KEIP, the parties agree
that the rule of decision comes from 11 U.S.C. § 503, which
governs the allowance of administrative expenses.  The point of
disagreement concerns which provision of § 503 applies.  Section
503 provides, in pertinent part:

**(c)** Notwithstanding subsection (b), there shall
neither be allowed, nor paid –

**(1)** a transfer made to, or an obligation incurred
for the benefit of, an insider of the debtor for the
purpose of inducing such person to remain with the
debtor's business, absent a finding by the court
based on evidence in the record that –

7

    **(A)** the transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;

    . . . .

    **(3)** other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.

11 U.S.C. § 503(c).  While § 503(c)(1) refers to transfers to insiders, § 503(c)(3) includes no such limitation, and the phrase "officers, managers, or consultants" would appear to include persons who fall outside the applicable statutory definition of "insider."  See 11 U.S.C. § 101(31)(B).

According to GTAT, the bankruptcy court erred by finding the KEIP to be a retention plan for insiders and applying § 503(c)(1) rather than treating the KIEP as an incentive plan and applying § 503(c)(3).  Determining which provision applies is significant because GTAT conceded at oral argument that it cannot meet the requirements of § 503(c)(1)(A)-(C).[5]  See also J.A., at JA-000722.

-----

[5] In addition to providing that an insider must hold a bona fide job offer before he or she may receive a retention bonus, § 503(c)(1) also requires that:

    **(B)** the services provided by the person are essential to the survival of the business; and

The dispositive question is whether the bankruptcy court correctly determined that the KEIP is a retention plan rather than some other kind of obligation outside of the ordinary course of business.  If so, the court correctly decided not to approve it, pursuant to 11 U.S.C. § 503(c)(1).  If not, the court erred by using § 503(c)(1) rather than § 503(c)(3) to evaluate the KEIP.

In a recent decision from the Eastern District of Missouri, Judge Surratt-States set out the relevant substantive law:

> Congress added Section 503(c) to the Bankruptcy Code in 2005 to "eradicate the notion that executives were entitled to bonuses simply for staying with the Company through the bankruptcy process."  In re Global Home Prods., LLC, 369 B.R. [778,] 784 [(Bankr. D. Del. 2007)] (internal quotations omitted).  A court "must

(C) either –

(i) the amount of the transfer made to, or obligation incurred for the benefit of, the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar kind given to nonmanagement employees for any purpose during the calendar year in which the transfer is made or the obligation is incurred; or

(ii) if no such similar transfers were made to, or obligations were incurred for the benefit of, such nonmanagement employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made to or incurred for the benefit of such insider for any purpose during the calendar year before the year in which such transfer is made or obligation is incurred.

11 U.S.C. § 503(c)(1).

examine a proposed [incentive plan] . . . and
determine whether the proposed targets are designed to
motivate insiders to rise to a challenge or merely
report to work." In re Hawker Beechcraft, Inc., 479
B.R. 308, 313 (Bankr. S.D.N.Y. 2012) (citing In re
Velo Holdings, 472 B.R. [201,] 209 [(Bankr. E.D.N.Y.
2012)]. A plan that does not require affirmative
action beyond that contemplated prepetition is not
incentive, but is retentive and cannot be approved
under the more lenient standards for incentive plans.
See In re Residential Capital, LLC [(Residential
Capital I)], 478 B.R. 154, 171-73 (Bankr. S.D.N.Y.
2012). A court must determine whether the debtor has
proposed a retentive plan disguised as an incentive
plan in order to circumvent the requirements of
Section 503(c)(1). In re Velo Holdings, Inc., 472
B.R. at 209. "Although a purported [incentive plan]
may contain some retentive effect, that does not mean
that the plan, overall, is retentive rather than
incentivizing in nature." Id. at 209-10 (citing In re
Dana Corp. ("Dana I"), 351 B.R. 96, 102 (Bankr.
S.D.N.Y. 2006)). The burden of proof that the
incentive plan is not a retentive plan lies with the
proponent of the plans. In re Hawker Beechcraft,
Inc., 479 B.R. at 313.

In re Patriot Coal Corp., 492 B.R. 518, 531 (Bankr. E.D. Mo.

2013). A plan proponent must satisfy its burden of proof by a

preponderance of the evidence. See In re Residential Capital,

LLC (Residential Capital II), 491 B.R. 73, 86 (Bankr. S.D.N.Y.

2013) (citation omitted).

In this case, the bankruptcy court determined that the KEIP

was subject to 11 U.S.C. § 503(c)(1) because it was a retention

plan disguised as an incentive plan. Indeed, "[a]ttempts to

characterize what are essentially prohibited retention programs

as 'incentive programs' in order to bypass the requirements of

section 503(c)(1) are looked upon with disfavor." Velo

Holdings, 472 B.R. at 209.  To determine whether a retention program has been disguised as an incentive program, "courts consider the circumstances under which particular proposals are made, along with the structure of the compensation packages." Id. (citing Dana I, 351 B.R. at 102).  With regard to the structure of a compensation package, for a bonus to qualify as "an incentive payment, the plan must present targets that are difficult to achieve, forcing the executives to work hard to achieve their bonuses." Residential Capital II, 491 B.R. at 86.

The problem with the bankruptcy court's decision in this case is that it ruled that the KEIP was a disguised retention plan without making any findings on the key question, i.e., whether the KEIP incorporates targets that are difficult to achieve.  The reported decisions in cases in which bankruptcy courts have been called upon to determine whether a compensation program is a legitimate incentive plan or a disguised retention plan generally contain detailed analyses of the plans at issue. See, e.g., Patriot Coal, 492 B.R. at 532-33; Residential Capital II, 491 B.R. at 86-87; Hawker Beechcraft, 479 B.R. at 313-15. Here, there is none of that.  Rather, the bankruptcy court relied exclusively upon statements from witnesses concerning the importance of GTAT's executive team to the success of its reorganization.

To be sure, some bankruptcy courts have mentioned the importance of retaining key executives when denying approval for incentive plans.  See, e.g., Hawker Beechcraft, 479 B.R. at 314; Residential Capital I, 478 B.R. at 168 n.2.  But, this court has found no case, and the Trustee has identified none, in which a bankruptcy court has declined to approve a proposed incentive plan for insiders based solely upon testimony concerning the importance of those insiders to the debtor's business. Moreover, while the bankruptcy court cited such testimony in Residential Capital I, the plan proponent in that case proposed a second insider incentive plan that was approved in Residential Capital II, notwithstanding the testimony reported in Residential Capital I.  The second plan was approved because it had stronger metrics than the first plan, see Residential Capital II, 491 B.R. at 87, and the analysis of the metrics in Residential Capital I necessarily gave the plan proponent guidance on how to draft the plan that was accepted in Residential Capital II.  In contrast, the lack of analysis in the bankruptcy court's decision in this case makes it impossible for GTAT to propose an alternative KIEP that might be accepted. Affirming the bankruptcy court's rejection of the KEIP for the reasons given in its decision would require this court to endorse the proposition that any mention of retentive effects by the proponent of an incentive plan would preclude the approval

of any plan advanced by that proponent.  That proposition, however, is inconsistent with the well accepted principle that a compensation plan does not lose its character as an incentive plan just because it has some retentive effect.  See Patriot Coal, 492 B.R. at 531.

To sum up, the bankruptcy court's failure to properly analyze the structure of the compensation package in GTAT's proposed KEIP is an error of law that requires remand.[6]  On remand, the bankruptcy court is instructed to determine whether the proposed KEIP has sufficiently stringent metrics to qualify as an incentive plan for the purposes of 11 U.S.C. § 503(c).

This court appreciates that GTAT has a strong interest in a quick resolution of this matter, and would prefer for this court to undertake the requisite analysis and rule in its favor without remand.  However, it is better for the bankruptcy court, in the first instance, to make the findings of fact and rulings of law necessary to decide whether the targets in GTAT's proposed KEIP are sufficiently rigorous for the KEIP to qualify as an incentive plan.  However, given the extensive record that has already been generated, this court can see no reason why the

---

[6] If the bankruptcy court had made factual findings to support its ruling that the KEIP is a disguised retention plan, based upon the weakness of its metrics, those findings would be subject to clear error review.  But where, as here, the bankruptcy court has not made the necessary findings, its failure to do so is an error of law.

13

bankruptcy court would need to take any further evidence, which
should allow it to act relatively quickly in response to this
remand order.

### B. Key Employee Retention Plan

With respect to approval of its proposed KERP, GTAT argues
that the rule of decision comes from 11 U.S.C. § 363(b)(1),
which governs the use, sale, or lease of property of the
bankruptcy estate "other than in the ordinary course of
business."  The Trustee contends that the rule of decision
comes from 11 U.S.C. § 503(c)(3), which governs administrative
expenses, including "other transfers or obligations that are
outside the ordinary course of business."  The Trustee has the
better argument.

In Patriot Coal, the court had before it an employee
retention plan.  See 492 B.R. at 527.  After determining that
the plan did not cover any insiders, which would have subjected
it to scrutiny under § 503(c)(1), the court acknowledged §
363(b)(1) but applied § 503(c)(3).  See id. at 536; see also
Residential Capital II, 491 B.R. at 84-85 (analyzing retention
plan for non-insiders under § 503(c)(3)); In re Global Aviation
Holdings Inc., 478 B.R. 142, 150 (Bankr. E.D.N.Y. 2012) (same).
As Judge Glenn explained in Residential Capital II: "Transfers
made in the ordinary course of business are evaluated under

14

section 363(c).  Transfers to insiders, or transfers made
outside the ordinary course of business, are subject to the
requirements of section 503(c)."  491 B.R. at 82.  It would seem
that Judge Glenn viewed § 503(c)(3) as superseding § 363(b)(1)
as the statute governing the evaluation of transfers, other than
retention payments to insiders, that are made outside the
ordinary course of business.

      In any event, Patriot Coal, Residential Capital II, and
Global Aviation all stand squarely for the proposition that
retention programs for non-insiders should be evaluated under
the § 503(c)(3) "facts and circumstances" test.  That said, the
court must also note that in each of those three cases, the
"facts and circumstances" test was treated as equivalent to the
business judgment test that courts apply under § 363(b)(1).
See, e.g., Patriot Coal, 492 B.R. at 531 (citing Velo Holdings,
472 B.R. at 212; In re Dana Corp. (Dana II), 358 B.R. 567, 576
(Bankr. S.D.N.Y. 2006)).  That is where this court parts company
with Patriot Coal, Residential Capital II, and Global Aviation
and instead, relies upon In re Pilgrim's Pride Corp., 401 B.R.
229 (Bankr. N.D. Tex. 2009).

      In Pilgrim's Pride, the court was faced with an incentive
plan for insiders that was subject to analysis under § 503(c)(3)
and its "facts and circumstances" test.  See 401 B.R. at 236.
In determining the scope of review under that test, Judge Lynn

relied upon various principles of statutory construction to reject the debtor's argument that the "facts and circumstances" test was the same as the § 363(b)(1) business judgment rule, under which "[a] debtor's business decision should be approved by the court unless it is shown to be so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice." In re SW Boston Hotel Venture, LLC, No. 10-14535-JNF, 2010 WL 3396863, at *3 (Bankr. D. Mass. Aug. 27, 2010) (quoting White v. Official Comm. of Unsecured Creditors (In re Cadkey Corp.), 317 B.R. 19, 22–23 (D. Mass. 2004)).[7]  After rejecting the debtor's argument, the court described the "facts and circumstances" test this way:

> In applying the simple business judgment test, courts are adjured to defer to the debtor in possession or trustee; if a valid business reason is shown for a transaction, the transaction is to be presumed appropriate.  See 7 Collier on Bankruptcy ¶ 1108.06 (15th ed. rev. 2006).
>
> The court concludes that section 503(c)(3) is intended to give the judge a greater role: even if a good business reason can be articulated for a transaction, the court must still determine that the proposed transfer or obligation is justified in the case before it.  The court reads this requirement as meaning that the court must make its own determination that the transaction will serve the interests of creditors and the debtor's estate.

---

[7] The § 363(b)(1) business judgment test has also been characterized as barring the bankruptcy court from substituting its judgment for that of the trustee or the debtor in possession.  See 3 Collier, supra, ¶ 363.02[4], at 363-19.

Pilgrim's Pride, 401 B.R. at 237.  "Although it has become the
minority view, the court in Pilgrim's Pride Corp. articulated
sound reasons for imposing a test stricter than the business
judgment test in section 363(b)."  4 Collier on Bankruptcy,
supra, ¶ 503.17[4], at 503-116.  This court is persuaded by
Pilgrim's Pride that 11 U.S.C. § 503(c)(3) directs courts to
give more scrutiny to the business judgment of debtors than is
permitted under the § 363(b)(1) business judgment test.

In reaching that conclusion, the court acknowledges that
Pilgrim's Pride was an insider incentive plan case rather than a
non-insider retention plan case, which means that Judge Lynn did
not need to "decide whether section 503(c)(3) was intended to
reach beyond transactions with insiders." 401 B.R. at 236.
Judge Lynn did not decide that issue, but, as noted above,
several other judges have determined that § 503(c)(3) does
govern transfers to non-insiders.  See, e.g., Patriot Coal, 492
B.R. at 536.  Moreover, while the judges in those cases may have
based their reliance upon § 503(c)(3) on a belief that the
"facts and circumstances" test was the same as the § 363(b)(1)
business judgment test, Judge Lynn's statutory analysis is
persuasive.  Beyond that, nothing in § 503(c) suggests that: (1)
§ 503(c)(3) was intended to be limited to transfers or
obligations to insiders; or (2) the facts and circumstances test
was intended to operate one way with respect to incentive plans

17

for insiders and another way with respect to retention plans for
non-insiders.  In short, the factual distinctions between this
case and Pilgrim's Pride do nothing to diminish this court's
conviction that § 503(c)(3) directs courts to give plans such as
the KERP in this case more scrutiny than is required by the §
363(b)(1) business judgment test.

        Having determined the proper level of scrutiny, the court
turns to a more straightforward issue, i.e., the substantive
framework for a bankruptcy court's review of a compensation plan
under § 503(c)(3).  To determine whether a compensation plan is
"justified by the facts and circumstances of the case," 12
U.S.C. § 503(c)(3), courts typically consider what have come to
be known as the Dana factors:

        — Is there a reasonable relationship between the plan
        proposed and the results to be obtained, i.e., will
        the key employee stay for as long as it takes for the
        debtor to reorganize or market its assets, or, in the
        case of a performance incentive, is the plan
        calculated to achieve the desired performance?

        — Is the cost of the plan reasonable in the context of
        the debtor's assets, liabilities and earning
        potential?

        — Is the scope of the plan fair and reasonable; does
        it apply to all employees; does it discriminate
        unfairly?

        — Is the plan or proposal consistent with industry
        standards?

        — What were the due diligence efforts of the debtor in
        investigating the need for a plan; analyzing which key

>    employees need to be incentivized; what is available;
>    what is generally applicable in a particular industry?
>
>    — Did the debtor receive independent counsel in
>    performing due diligence and in creating and
>    authorizing the incentive compensation?

Patriot Coal, 492 B.R. at 531 (quoting Dana II, 358 B.R. at 576-77) (emphasis omitted); see also Residential Capital II, 491 B.R. at 84-85 (employing the Dana factors to determine whether to approve retention plan for non-insider employees); Global Aviation, 478 B.R. at 150-51 (same).

With respect to the KERP in this case, the bankruptcy court found that the proposed retention payments were not likely to inspire the targeted employees to stay with the company and ruled that "the KERP falls below the business judgment standard." J.A., at JA-000920. There are two fundamental problems with the bankruptcy court's decision. First, it would appear that the court considered, at most, only the first of the six Dana factors. Second, while the decision refers to the "business judgment standard," it is not clear whether the court applied the highly deferential § 363(b)(1) test or the less deferential test from Pilgrim's Pride. Without knowing which standard the bankruptcy court employed, this court cannot undertake a meaningful review. The bankruptcy court's inadequate consideration of the Dana factors and its failure to specify its standard of review are errors of law that require

remand.  On remand, the bankruptcy court is instructed to: (1)
analyze the proposed KERP in terms of the Dana factors; and (2)
do so with the level of scrutiny described in Pilgrim's Pride.

## IV. Conclusion

For the reasons described above, this matter is remanded to
the bankruptcy court for further proceedings consistent with
this order.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

July 21, 2015

cc:   Jason R. Adams, Esq.
      Holly J. Barcroft, Esq.
      Eric Bradford, Esq.
      James S. Carr, Esq.
      Luc A. Despins, Esq.
      Jeremy R. Fischer, Esq.
      Steven E. Grill, Esq.
      James T. Grogan, Esq.
      Brad M. Kahn, Esq.
      Geraldine L. Karonis, Esq.
      Mark Tyler Knights, Esq.
      Benjamin Marcus, Esq.
      Charles R. Powell III, Esq.
      Abid Qureshi, Esq.
      Sumi Sakata, Esq.
      Daniel W. Sklar, Esq.
      Andrew V. Tenzer, Esq.
      Robert E. Winter, Esq.
      Philip C. Dublin, Esq.